UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| IN RE: BIOMET M2a MAGNUM HIP IMPLANT PRODUCTS LIABILITY LITIGATION (MDL 2391) | ) ) ) ) ) ) ) ) CAUSE NO. 3:12-md-2391 |
| This Document Relates to All Cases | |

### AMENDED EXPLANT PRESERVATION ORDER

The Court ORDERS, effective immediately, that Defendants and Plaintiffs (collectively, the "Parties") shall comply with the following directives relating to the preservation of explanted metal-on-metal hip prostheses in the above-captioned case. This order does not address or resolve issues relating to admissibility under FED. R. EVID. 702, or any other state or federal rules of evidence or procedure.

**I.   DEFINITIONS**

    **A.   Biomet Devices Subject to this Order**

The provisions of this order shall pertain to the following:

1. "$M^2a$ Device" means the following Biomet $M^2a$ Hip System Device and components marketed and sold by defendants to plaintiffs in the United States: $M^2a$ Magnum and $M^2a$ 38.

2. "Explanted $M^2a$ Device" means the $M^2a$ Device explanted from a plaintiff in this litigation, and tissue samples, if any, that were retrieved during the explant surgery.

**II.   RETRIEVAL ANALYSIS PROTOCOL**

Pursuant to Section 522 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360*l*, Biomet is required by the Food and Drug Administration ("FDA") to conduct post-market surveillance on the $M^2a$ Devices at issue in this litigation ("Section 522 Postmarket Surveillance"). "Biomet's Retrieval Analysis Protocol," attached hereto as Exhibit A, represents a reasonable protocol (though not necessarily the only reasonable protocol) designed to enable preservation and analysis of Explanted $M^2a$ Devices and surrounding tissues.

Any initial inspection and analysis shall be non-destructive except to the extent Biomet might be required to conduct destructive testing under the Biomet Retrieval Analysis Protocol set forth in Exhibit A. Neither party will conduct destructive testing on an Explanted $M^2a$ Device without prior written consent of the other party or by order of this court. A party intending on

performing destructive testing shall provide written notice of said intention to the opposing counsel set forth in Paragraph VIII herein and to the opposing party's Lead MDL Counsel. If the party seeking destructive testing does not receive any objection to said destructive analysis within 30 days of issuing the initial notice in writing, that party may proceed. Any disagreement between the parties regarding destructive testing shall be resolved by the court.

Reasonable compliance with Biomet's Retrieval Analysis Protocol, or another retrieval analysis protocol that is non-destructive and consistent with methods and practices accepted by those in the field of the inspection and testing of orthopaedic devices, and with this Order shall not constitute spoliation of evidence.

### III.  OBTAINING EXPLANTED $M^2a$ DEVICES

#### A.  $M^2a$ Devices that have not been Explanted or are not in Either Party's Possession

With respect to $M^2a$ Devices that have not yet been explanted or have been explanted but are not in either party's possession, counsel for a plaintiff may elect to obtain plaintiff's Explanted $M^2a$ Device from plaintiff's surgeon or the hospital where the surgery occurred and send it to a contract laboratory of plaintiff's choice or a designated storage facility. If plaintiff's counsel does not elect to obtain an Explanted $M^2a$ Device within 60 days of the revision surgery, Biomet will make arrangements for it to be sent to Malcolm Naylor of Biomet in Warsaw, Indiana.

The party that obtains the Explanted $M^2a$ Device shall comply with the requirement that the explant shall be preserved in accordance with either Biomet's Retrieval Analysis Protocol or another retrieval analysis protocol used by an individual or institution in the field of orthopaedic device retrieval and analysis that uses a non-destructive method of explant retrieval and analysis.

The Parties shall take reasonable measures to ensure that their respective contract laboratories and/or designated storage facilities maintain the Explanted $M^2a$ Devices, including all component parts, in the same condition as they were in when received, which includes refraining from altering the structure, existence, integrity, and nature of the device surfaces as explanted.

#### B.  Explanted $M^2a$ Devices in a Party's Possession

With respect to Explanted $M^2a$ Devices that were obtained by either party prior to the entry date of this Order:

1. A party that has an Explanted $M^2a$ Device in its possession shall provide notice to the other party, including information as to the corresponding plaintiff's name and surgeon, date of explantation, location of explant, and whether synovial fluid and/or whole blood/serum was retained.

2. To the extent that plaintiff's counsel has a reasonable belief that Biomet, directly or indirectly through an independent distributor or associated third party, retrieved a plaintiff's Explanted $M^2a$ Device after removal, plaintiff's counsel may send a written request to Biomet for information relating to the location and condition of said removed device components and any related pathology or specimens. Biomet shall undertake a reasonable search for the location of such plaintiff's Explanted $M^2a$ Device and shall make good faith efforts to ensure the same is preserved consistent with this order including, refraining from destructive testing without notice and the opportunity to object.

3. If a party inspected or tested an Explanted $M^2a$ Device that was obtained prior to the entry of this Order, the results of such inspection and testing shall be provided to the other party pursuant to this Order or the Parties' mutual agreement.

C. **Access to Explanted $M^2a$ Devices**

A party has the right to obtain an Explanted $M^2a$ Device after the completion of inspection and testing by the other party's contract laboratory(s) or expert(s). Each party shall make reasonable efforts to assure that its testing is completed within a reasonable amount of time. Upon written request and at the expense of the requesting party, after the completion of the inspection and testing of the Explanted $M^2a$ Device, the party in possession of the Explanted $M^2a$ Device shall send the device to the requesting party. Handling and packaging of the Explanted $M^2a$ Device by the plaintiff shall be performed either in accordance with Biomet's Retrieval Analysis Protocol or in accordance with another retrieval analysis protocol that is non-destructive and consistent with methods and practices accepted by those in the field of the inspection and testing of orthopaedic devices.

IV. **RETRIEVAL AND ANALYSIS OF EXPLANTED $M^2a$ DEVICES**

The procedures set forth in Biomet's Retrieval Analysis Protocol represent one reasonable protocol for (1) retrieval, handling, and packaging of Explanted $M^2a$ Devices; (2) the collection of clinical history of the plaintiff and the $M^2a$ Device; (3) collection of tissue and fluid samples near the $M^2a$ Device; (4) photographic record of the Explanted $M^2a$ Device and tissues; (5) containing, labeling, cleaning, decontaminating, packaging, and shipping of retrieved implant, tissue, or fluid samples; (6) analysis of tissue and fluids; and (7) analysis of retrieved components.

The Parties will not object to retrieval and analysis of an Explanted $M^2a$ Device that is either reasonably consistent with Biomet's Retrieval Analysis Protocol or another retrieval analysis protocol that is non-destructive and consistent with methods and practices accepted by those in the field of the inspection and testing of orthopaedic devices and with this Order.

## V.    INSPECTION RESULTS

The Parties shall exchange all inspection and analysis results including data, photographs, and other information generated as a result of the retrieval and analysis of the Explanted $M^2a$ Devices conducted pursuant to the Case Management Order of this court and this Order. The agreement to exchange the results of inspection and analysis does not require the exchange of drafts, privileged communications, or facts or opinions of a consulting expert employed for trial preparation.

## VI.   COMPLIANCE

A plaintiff shall make good faith efforts to ensure that non-party medical practitioners, hospitals, and vendors engaged to facilitate device preservation preserve his or her Explanted $M^2a$ Devices that may be relevant to the claims, defenses, or subject matter of his or her case consistent with this order. The Defendants will not take steps that interfere with requests by or on behalf of a plaintiff to have the plaintiff's surgeon and/or hospital retain and preserve any Explanted $M^2a$ Device(s), tissue, or any other physical evidence.

The Parties agree that they will not promote or encourage third parties, including, but not limited to, physicians and hospital personnel, to act in a way that is inconsistent with this Order.

To the extent an explanted Biomet metal-on-metal device and any surrounding tissues has been preserved, but no longer needs to be retained for litigation purposes by a plaintiff, the device and surrounding tissue should be delivered to Biomet. The cost of transporting the device by Federal Express to Biomet will be paid by Biomet. Any plaintiffs' counsel who is going to ship an explanted device to Biomet should coordinate with Biomet's liaison counsel identified in this Amended Explant Preservation Order regarding the logistics of returning an explanted device to Biomet.

## VII.  PROTOCOLS SHALL NOT BE BINDING

Neither party's protocols for the retrieval, transport, storage, inspection, and testing of the $M^2a$ Devices shall be binding on the other party. As long as either party's protocols or practices for the retrieval, transport, storage, inspection, and testing of $M^2a$ Devices are non-destructive and consistent with methods and practices accepted by those in the field of the inspection and testing of orthopaedic devices, that party shall be deemed to be in compliance with this Order, and those actions shall not constitute spoliation of evidence.

4

## VIII. COURT OVERSIGHT

The process of obtaining Explanted Biomet $M^2a$ Devices from surgeons and hospitals and sending them to contract laboratories for inspection and testing is likely to involve complications that the Parties and this Court have not anticipated. To assist in the resolution of potential complications, the Court shall remain actively involved in this process, and the Parties shall keep the Court apprised, in writing, of encountered complications. In the event a dispute arises between a surgeon or hospital and a party or a party's counsel regarding an Explanted $M^2a$ Device, the party's counsel shall seek relief in this court, and this court will intervene, consistent with the Federal Rules of Civil Procedure, to resolve the dispute. To facilitate the Court's involvement in resolving any complications arising from this Order, the Court designates Plaintiff's Executive Committee Member Justin Presnal (JustinP@fisherboyd.com) of Fisher Boyd Johnson & Huguenard LLP, and Defendants' Liaison Counsel John LaDue (jladue@lck-law.com) of LaDue Curran & Kuehn LLC as the contact persons who will field any questions and bring to the Court those issues requiring court involvement.

SO ORDERED.

ENTERED: November 24, 2015

      /s/ Robert L. Miller, Jr.
Judge
United States District Court

Biomet's Retrieval Analysis Protocol

# EXHIBIT A

1. **SCOPE**

This document describes the protocol for the retrieval and analyses of Explanted Biomet Devices. The objective of this protocol is to enable preservation and analysis of Explanted Biomet Devices and surrounding tissues in a manner that may constitute evidence related to this litigation, as well as to permit Biomet to comply with its postmarket surveillance obligations pursuant to Section 522 of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. 3601. The investigation of the Explanted $M^2a$ Devices is non-destructive and will be performed on all reasonably available Explanted $M^2a$ Devices.

2. **REFERENCES**

ASTM F561 – 05a (Reapproved 2010):  Standard Practice for Retrieval and Analysis of Medical Devices, and Associated Tissues and Fluids

ISO 12891-1: 2011  Implants for surgery – Retrieval and analysis of surgical implants, Part 1: Retrieval and handling

ISO 12891-2: 2000  Implants for surgery – Retrieval and analysis of surgical implants, Part 2: Analysis of retrieved metallic surgical implants

ASTM E860 – 07:  Standard Practice for Examining and Preparing Items That Are Or May Become Involved in Criminal or Civil Litigation

ASTM E1188 – 05: Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator

ASTM E620:  Standard Practice for Reporting Opinions of Scientific or Technical Experts

ASTM E678:  Standard Practice for Evaluation of Scientific or Technical Data

3. **TERMS AND DEFINITIONS**

<u>Metal on metal component</u>:  a component of a total hip replacement whereby the articulating surfaces of both the ball and socket are intended to be Co-28Cr-6Mo per ASTM F75 or F1537.

<u>Reasonably available retrieval</u>: any Explanted $M^2a$ Device obtained by a Party pertaining to a Plaintiff in this litigation.

4. **PROCEDURES FOR RETRIEVAL, HANDLING AND PACKAGING**

Institutional guidelines for the retrieval, handling and packaging of potentially infectious materials shall be utilized.  In situations where institutional guidelines do not exist, the specifications outlined in ISO 12891-1 can be utilized.

Specific requirements for this retrieval study:

- When handling, packaging and shipping the retrieved components, the hospital or clinic should avoid putting all the components in the same container without

separating packaging. Ideally, each retrieved component should be individually wrapped and stored in its own container, then placed in a larger container with all the other retrieved components. This will prevent further damage to the explants, which can be difficult to distinguish from *in situ* damage.

- Shortly after removal, a detailed record of any damage caused to the components during extraction should be performed, especially in the presence of the operating surgeon. Adequate 'macro' photography can also be helpful. This information should be labeled adequately and should accompany the explanted components. This will make it easy to differentiate between damaged regions caused in vivo and those caused during extraction.

- It is imperative to label the retrieved parts adequately for future identification.

- The retrieved components should be marked in a non-destructive way to indicate their orientation *in situ* before removal. If the implants are not marked before extraction or immediately after, then the true location of the wear scars can only be guessed. This can be avoided easily by marking the superior rim of the cup and the base of the femoral head.

- Sterilization of metal on metal components should be performed utilizing cold techniques. Do NOT sterilize metal on metal components by steam autoclave as this may alter features or surfaces which may be essential in determining failure modes.
    - In situations where the device has already been sterilized by steam autoclave prior to coming into Biomet's control, the investigator may still perform the retrieval analysis taking into consideration the potential confounding factors introduced by the steam autoclave procedure.
    - Where residual tissues are retained on or within the components, fixation by 10% buffered formalin and/or ethanol and/or other fixative will be included in the sterilization procedure.

**5. COLLECTION OF CLINICAL HISTORY OF THE IMPLANT AND PATIENT**

Whenever possible, the clinical history of the Plaintiff and the Explanted M2a Device shall be obtained and recorded.

This clinical history shall include at least the following, if available:

- the name or identification number of the patient as permitted by HIPAA or other applicable national regulations;

- the original diagnosis which resulted in the use of the surgical implant;

- the identification of the components inserted, including part number and lot number;

- an X-ray of the surgical implant in situ taken after the insertion operation;

8

- an X-ray of the surgical implant in situ taken prior to the retrieval operation;

- the patient's activity level including the ability to perform work, sports and recreational activities;

- metal ion analysis of blood or serum for levels of cobalt and chromium;

- the patient's medical history relevant to the surgical implant, including the hospital or clinic at which the surgical implant was implanted;

- information on the patient's experience with the surgical implant just before surgical implant retrieval including any audible noises emanating from the joint;

- sex, height and weight of the patient;

- the date of the insertion operation;

- the date of the retrieval operation;

- observations during the retrieval operation including stability of the cup or dark staining of the surrounding tissues;

- the reason for explantation of the components;

- the hospital or clinic at which the surgical implant was inserted;

- the hospital or clinic at which the surgical implant was retrieved.

**The information obtained will be treated as confidential by the Parties.**

6. **COLLECTION OF TISSUE AND FLUID SAMPLES NEAR THE IMPLANT**

In order to assist in the determination of the failure mode for the retrieval, it is recommended that local tissue and fluid samples are obtained during the retrieval operation. The general procedure for this collection is contained within section 3.4 of ISO 12891-1 which is excerpted below:

> *Taking into account the need for patient safety, if tissue and/or fluid samples are to be collected for analysis, then these shall be retrieved in a manner which causes as little damage as possible to both the surgical implant and the tissues.*
>
> *For microbiological investigation, swabs, tissue and/or fluid samples shall be taken from a location adjacent to the implant as soon as possible after the surgical implant has been exposed. Where and how the specimens are taken shall be recorded.*
>
> *For histological examination, tissue samples shall be taken from a location adjacent to the implant and/or*

9

*from other relevant sites (e.g. lymph nodes or any tissue with abnormal appearance). When possible, tissue samples for histological examination shall include portions extending into the normal tissue.*

*The site of the tissue excision and the orientation of the tissue relative to the surgical implant shall be indicated and recorded. Where possible, the proximal end of the tissue shall be marked (e.g. with a suture). Where necessary, the original length of the tissue shall be maintained (e.g. with plastic muscle biopsy clamps or by pinning the tissue to a corkboard or by other means, which avoid contact with metal which could corrode).*

*The tissue samples for histological examination shall be transferred as early as possible to an appropriate fixative or other media. The type of fixative used and the time between excision and placement in the fixative or media shall be documented. The tissue sample shall be treated in a routine manner as required for histological examination, unless a special method is needed for special investigations. If appropriate, the media used to preserve tissue attached to a retrieved surgical implant shall be selected so as not to affect the surgical implant. When it is not possible to preserve the tissues without affecting the retrieved surgical implant, the portions of the retrieved surgical implant to be analyzed should be determined and the tissue preserved accordingly.*

*Fluids obtained by aspiration shall be appropriately preserved for examination unless a special method is needed for special investigations. The preservation method should be chosen taking into account the intended analysis.*

### 7. PHOTOGRAPHIC RECORD OF THE EXPLANTED DEVICE AND TISSUES

Where appropriate, photographic records shall be made of the surgical implant *in situ*, of the surgical site and of the explanted surgical implant and any associated tissue specimens.

Where appropriate, the orientation of all removed surgical implant components in relation to each other and their placement in relation to the body and associated excised material shall be recorded. If not self-explanatory, the proximal end and the orientation in the transverse plane of the implant shall be marked and documented. Any observed abnormalities in the appearance or condition of the device shall be recorded.

### 8. CONTAINING, LABELING, CLEANING, DECONTAMINATING, PACKAGING AND SHIPPING OF RETRIEVED IMPLANT, TISSUE, OR FLUID SAMPLES

General instructions for labeling, cleaning, decontaminating, packaging and shipping of retrieved implants, tissue, or fluid sample are found in sections 3.6, 3.7, 3.8, 3.9, & 3.10 of ISO 12891-1.

In addition to these general instructions

- When handling, packaging and shipping the retrieved components, the hospital or clinic should avoid putting all the components in the same container without separating packaging. Ideally, each retrieved component should be individually wrapped and stored in its own container, then placed in a larger container with all the other retrieved components. This will prevent further damage to the explants, which can be difficult to distinguish from *in situ* damage.

10

- Shortly after removal, a detailed record of any damage caused to the components during extraction should be performed, especially in the presence of the operating surgeon.  Adequate 'macro' photography can also be helpful.  This information should be labeled adequately and should accompany the explanted components.  This will make it easy to differentiate between damaged regions caused in vivo and those caused during extraction.

- It is imperative to label the retrieved parts adequately for future identification.

- The retrieved components should be marked in a non-destructive way to indicate their orientation *in situ* before removal.  If the implants are not marked before extraction or immediately after, then the true location of the wear scars can only be guessed.  This can be avoided easily by marking the superior rim of the cup and the base of the femoral head.

- Sterilization of metal on metal components should be performed utilizing cold techniques. Do NOT sterilize metal on metal components by steam autoclave as this may alter features or surfaces which may be essential in determining failure modes.

- As soon as possible, ship the following:

    - Clinical information per section 5
    - Photographic records per section 7
    - Retrieved implants
    - Tissue or fluids, if applicable

    To the following address:
    Clinical Studies – MOM Litigation Retrieval
    Biomet Orthopedics
    56 E. Bell Drive
    Warsaw, IN  46582

9. **ANALYSIS OF TISSUE AND FLUIDS**

Analysis of tissue and fluids will be performed per ISO 12891 and/or ASTM F561.  In addition to these protocols, an ALVAL histological score for the tissue shall be made pursuant to the following reference:

> Campbell P, Ebramzadeh E, Nelson S, Takamura K, De Smet K, & Amstutz HC, Clinical Orthopaedics and Related Research, 2010; 468(9):2321-7.

*A number of new consensus standards are currently under development within ASTM committee F04.  Where appropriate and reasonable, new standards will be considered for studies.

**10.    ANALYSIS OF RETRIEVED COMPONENTS – VISUAL ANALYSIS**

Visual analysis will be performed on all reasonably available retrievals.  Visual analysis shall include the observation of the components with the unaided eye or with the aid of a stereomicroscope.  If the retrieval contains more than one component, each component should be analyzed.  The following information shall be recorded:

- Unique retrieval code to identify the components
- Catalogue and lot number of each component along with device description
- Markings found on the implant, such as logos, part numbers, or lot numbers
- Date of analysis
- Date retrieved
- Implant duration, if available
- Reason for explantation, if available

Examination of the component will include all surfaces of the components looking for evidence of in service or iatrogenic damage.  The following features shall be documented for presence, size/area, location, and severity/degree:

- Bearing surface(s)
    - Wear
    - Scratches
    - 3rd body damage
    - Corrosion
    - Embedded particles
    - Discoloration or staining
    - Impingement
    - Edge damage/subluxation
    - Equatorial contact
    - Stripe wear formations, both superior and inferior stripes on cup and head
    - Evidence of, or exclusion of, a polished main wear zone
    - Surface pitting

12

- - o   Wear scars exceeding to the cup rim and beyond
- Taper junction(s)
    - o   Fretting
    - o   Corrosion
    - o   Discoloration or staining
    - o   Evidence of head or adapter stuck on neck taper
- Non-bearing surfaces
    - o   Cup front face damage
    - o   Cup edge/rim damage, both superior and inferior edges
    - o   Backside damage, i.e. any damage to the backing of the cup (e.g. removal of porous coating) or bottom face of the femoral head
    - o   Fretting damage caused by fixation screws, if present

The location of these features will be indicated by performing concise wear mapping of the worn features on both articulating and non-articulating surfaces.

**11.   ANALYSIS OF RETRIEVED COMPONENTS AND RECORDS – PHYSICAL ANALYSIS**

If the following minimal clinical history/information is available:

- Date of implantation
- Date of explantation
- X-rays
    - o   Post-operative
    - o   Prior to explantation
- Cup inclination
- Cup anteversion
- Sex, Height and weight of patient
- Activity level of patient

and after patient consent has been obtained, the following physical analyses will be

performed:

- If an explanted device is determined to have been well-positioned *in situ* and is associated with adverse tissue reactions, or has obvious high wear/damage, then every effort should be made to estimate the total volumetric wear from the explanted components.  A suggested technique includes a three-dimensional coordinate measuring machine (CMM) to measure changes in component radius of curvature of both worn and unworn surfaces.  Estimations of volumetric wear can then be determined using 3D modeling software.

- Surface roughness measurements of damaged and undamaged Co-Cr-Mo surfaces, including at least: average roughness (Ra or Sa), surface texture (Rz or Sz), maximum scratch height (Rp or Sp) and skewness (Rsk or Ssk), plus be accompanied by close-up photographs for each measurement site to provide a visual indication of the amount of wear that took place and what wear processes were involved

- Scanning electron microscopy to examine microstructural features such as topography, carbide morphology, grain structure (if visible), along with EDS to determine surface chemistry, for both the bearing surfaces and the taper junction.  The analysis should include investigation of any material transfer, embedded debris or corrosion product on the surfaces.